968 F.2d 19
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 BEAVER CREEK COAL COMPANY, Plaintiff-Appellee,
v.
NEVADA POWER COMPANY, Defendant-Appellant.
 No. 89-4114.
 United States Court of Appeals, Tenth Circuit.
 May 27, 1992.
 
 Before HOLLOWAY and McWILLIAMS, Circuit Judges, and BRATTON,*
 ORDER AND JUDGMENT**
 HOLLOWAY, Circuit Judge.
 
 
 1
 The primary issue in this appeal is whether the district court in the District of Utah erred in interpreting a coal supply contract on summary judgment. The court ruled as a matter of law that the Equity Clause in the parties' agreement did not contemplate the buyer's claim of inequity based upon an increase in the contract price of coal to a level significantly higher than the prevailing market price. For essentially the same reasons as were given by the district court, we affirm.
 
 
 2
 * In 1980 an electric utility, Nevada Power Company (Nevada Power), as purchaser and Beaver Creek Coal Co. (Beaver Creek) as seller concluded a long-term coal supply agreement. By its terms the agreement was effective for approximately 15 years, from March 1980 through December 1994. The contract terms established a base price for all coal delivered under the agreement of $20 per ton f.o.b. Acco, Utah. Under Section 8 of the contract, the parties agreed to make the base price adjustable on the basis of variables, including specified United States Department of Labor statistical indices, royalty rates, labor costs, and taxes.[1]
 
 
 3
 In addition to the price Adjustment Clause, the agreement contained language the parties described in general terms as an "equity clause." Section 9, entitled "Inequity and Hardship," provided:
 
 
 4
 It is the intent of the parties hereto that this Agreement, as a whole and in all of its parts, shall be equitable to both parties throughout its term. The parties recognize that omissions or defects in this Agreement beyond the control of the parties or not apparent at the time of its execution may create inequities or hardship during the term of the Agreement, and further, that supervening conditions, circumstances or events beyond the reasonable and practicable control of the parties may from time to time give rise to inequities which impose economic or other hardships upon one or both of the parties.
 
 
 5
 In the event an inequitable condition occurs which adversely affects one party, it shall be the joint and equal responsibility of both parties to act promptly to determine the action required to cure the inequity and effectively to implement such action. Upon written claim of inequity served by one party upon the other, the parties shall act jointly to reach an agreement concerning the claimed inequity within sixty (60) days of the date of such written claim. The party claiming inequity shall include in its claim such information and data as may be reasonably necessary to substantiate the claim and shall freely and without delay furnish such other information and data as the other party reasonably may deem relevant and necessary.
 
 
 6
 Coal Supply Agreement Sec. 9, at 12-13. The dispute between the parties focuses on the intended operation of the Equity Clause in relation to the base price Adjustment Clause.
 
 
 7
 The parties generally agree that by mid-1987 the base price adjustment formulas had increased the contract price to approximately $34 per ton, while the market price remained in the $20 range. In June 1987, Nevada Power sent a letter to Beaver Creek claiming an inequity under Section 8 of the contract, in part on the ground that the contract price had "increased to a level significantly higher than prevailing market price." II R.Doc. 103(a) Ex. F(1).
 
 
 8
 Following unsuccessful negotiations between the parties over Nevada Power's Section 9 claim, Beaver Creek filed this diversity action in the District of Utah in October 1987. In an amended complaint Beaver Creek sought, in part, a ruling by a declaratory judgment that Nevada Power was not entitled to relief under the Equity Clause. I R.Doc. 86.
 
 
 9
 In an unpublished Memorandum Decision and Order the district court decided that summary judgment interpreting the agreement was appropriate because the contract language was unambiguous as a matter of law. Without considering extrinsic evidence, the district court interpreted the Equity Clause as encompassing two categories of inequity claims: "one based on defects or omissions in the Agreement and one based upon supervening conditions, circumstances or events." III R.Doc. 141, at 8. The court concluded that Nevada Power had not presented valid claims within either category. The district court then entered final judgment in favor of Beaver Creek. Id. Doc. 163.[2]
 
 
 10
 We review a district court's ruling on a motion for summary judgment de novo, applying the same standard that the district judge used. Osgood v. State Farm Mut. Auto Ins. Co., 848 F.2d 141, 143 (10th Cir.1988). On summary judgment, we view all proffered summary judgment materials in the light most favorable to the non-moving party. Id. Summary judgment is proper only if the moving party has shown that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).
 
 II
 
 11
 Nevada Power contends that summary judgment was improper because it proffered extrinsic evidence of the parties' intent that created genuine issues of material fact over the meaning of the contract language. However, under the general rules of contract interpretation that Utah follows, a court must attempt to determine the intended meaning of a contract from the plain language of the instrument before considering extrinsic evidence about the parties' intended meaning. See, e.g., Plateau Mining Co. v. Utah Div. of State Lands & Forestry, 802 P.2d 720, 725 (Utah 1990); Utah Valley Bank v. Tanner, 636 P.2d 1060, 1061-62 (Utah 1981). If the meaning of a contract is clear and unambiguous, extrinsic evidence generally is not admissible to explain the parties' intent. E.g., Faulkner v. Farnsworth, 665 P.2d 1292, 1293 (Utah 1983). Thus, we must address first the district court's ruling that the contract language was unambiguous as a matter of law. See, e.g., Gomez v. American Elec. Power Serv. Corp., 726 F.2d 649, 651 (10th Cir.1984) (applying Utah law); Faulkner, 665 P.2d at 1293; Morris v. Mountain States Tel. & Tel. Co., 658 P.2d 1199, 1200 (Utah 1983).
 
 
 12
 If the language of a contract is unambiguous, a court may appropriately enter summary judgment on the issue of interpretation. See Gomez, 726 F.2d at 651. See generally Charles A. Wright et al., Federal Practice and Procedure § 2730.1, at 280-81 (2d ed. 1983) (explaining construction of contract may properly be decided on summary judgment if parties' intentions are not at issue). However, an ambiguous contract cannot be interpreted on summary judgment if genuine issues of material fact exist over the parties' intended meaning. E.g., Gomez, 726 F.2d at 651.
 
 
 13
 Nevada Power seeks to demonstrate that the language of the Equity Clause is ambiguous because the parties presented differing, yet reasonable, interpretations. In general, a "contract is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.' " Winegar v. Froerer Corp., 813 P.2d 104, 108 (Utah 1991) (quoting Faulkner, 665 P.2d at 1293). The Equity Clause is not ambiguous as a matter of law merely because the parties have offered different interpretations. See, e.g., Plateau Mining Co., 802 P.2d at 725. Rather, the parties' differing interpretations of the contractual language must each be tenable in order to create ambiguity as a matter of law. See, e.g., Plateau Mining Co., 802 P.2d at 725.
 
 
 14
 Nevada Power contends that the parties intended the base price Adjustment Clause "to approximate Beaver Creek's costs of production." Appellant's Brief at 15. Further, Nevada Power contends that the parties intended for the Equity Clause "to operate if the contract price failed to approximate Beaver Creek's costs of production." Id. at 19.
 
 
 15
 In interpreting the agreement, we must apply the general rule of contract interpretation that requires us to attempt to interpret an instrument based upon the plain language, by reading each provision "in relation to all of the others, with a view toward giving effect to all and ignoring none." Utah Valley Bank, 636 P.2d at 1061-62. Our reading of the contract as a whole convinces us that the parties did not intend for Section 9 to address claims of inequity resulting merely from a disparity between market and contract price such as developed here. We thus conclude that the district court was not in error in ruling that the contract was unambiguous.
 
 
 16
 We do not view the Nevada Power interpretation as reasonable. We reach this conclusion in part on the basis of the base price adjustment provisions in Section 8. The contract language indicates that the parties intended to tie the price to variables other than the market price. We agree with appellee Beaver Creek's argument that the contract does not indicate that the parties intended the contract price to approximate the market price or to track its production costs. Some other mechanism designed to determine the actual market price of coal and to track Beaver Creek's production costs could have been fashioned to do that. Furthermore, the contract contained no price-reopener provision. We would effectively rewrite the price formula in the contract if we interpreted the language to mean that one party was free to reopen price negotiations through the Equity Clause because the contract price did not track the market price.
 
 III
 
 17
 We next address whether the district court properly granted summary judgment respecting this contract controversy. Concerning the first category of claims within the Equity Clause, the district court concluded that "a party must establish, among other things ... the existence of a defect or omission [and] ... that the defect or omission was beyond the control of the parties or not apparent at the time of the contract's execution." III R.Doc. 141, at 9. Applying a mutual mistake analysis, the district court held that Nevada Power had not established a claim of a defect or omission in part because it was apparent that Beaver Creek's intent was clearly reflected in the written agreement and that Beaver Creek did not share with Nevada Power a mutual intent contrary to the agreement. Id. at 10-11. The court ruled also that Nevada Power had failed to show a defect or omission that was either beyond the parties' control or not apparent at the time they executed the contract. Id. at 11. The court decided that the detailed price adjustment formulas in Section 8 showed that "the parties' mutual intent was to structure price adjustments independent of the market price." Id. at 11-12.
 
 
 18
 We agree with the district court's reading of the requirements for a claim based on a defect or omission. The district court's interpretation of the clause is the proper interpretation based on the plain language. Moreover, we agree with the district court's conclusion that Nevada Power's claim of inequity based upon a market price/contract price disparity was not a defect or omission not apparent to the parties at the time the agreement was executed. As the district court observed, the language of the agreement indicates that the parties intended to structure a pricing formula independent of the market price.
 
 
 19
 The district court further concluded that in order to prove claims based on inequities resulting from "supervening conditions," a party would be required to "show the existence of 'supervening conditions, circumstances or events beyond the reasonable control of the parties.' " III R.Doc. 141, at 9. The court defined supervening to mean "unlooked-for or unforseeable." Id. at 13. The court concluded that Nevada Power's claim of inequity was not within Section 9 because a change in the market price of coal during the 15-year term of the contract could reasonably have been anticipated by the parties. Id. at 13-14.
 
 
 20
 We believe the district court's interpretation of the word "supervening" is reasonable. The rest of the phrase--"or events beyond the reasonable and practicable control of the parties"--demonstrates the parties' intent. The inequity that Nevada Power claims here was reasonably and practicably within the parties' control to address; the parties could have tied the contract price to the market price by another contractual mechanism.
 
 
 21
 Nevada Power relies on Aluminum Company of America v. Essex Group, Inc., 499 F.Supp. 53 (W.D.Pa.1980). Nevada Power argues that the ALCOA opinion distinguished fixed price cases from the type of indexed price agreement in ALCOA; it says the ALCOA opinion rejected the idea that ALCOA was bound inescapably by the contract to bear the risk of divergence of the market price. Nevada Power reasons that here it entered into a contract with Beaver Creek with a similar sophisticated price formula, including a combination of government indices and actual costs to limit risks; that the district court here failed to address the interaction between the Equity Clause and the Adjustment Clause and mistakenly applied fixed-price contract doctrine. Appellant's Brief at 37-38.
 
 
 22
 We are not persuaded by the argument built on the ALCOA opinion. That decision was based on findings of mutual mistake, impracticability, and frustration of purpose. ALCOA, 499 F.Supp. at 63, 73, 78. Those grounds for relief are not shown here. ALCOA has generally not been found convincing by other courts. See United States v. Southwestern Elec. Coop., Inc., 869 F.2d 310, 315 n. 7 (7th Cir.1989); Printing Indus. Ass'n v. International Printing & Graphic Communications Union, 584 F.Supp. 990, 998 (N.D.Ohio 1984) (quoting Wabash, Inc. v. Avnet, Inc., 516 F.Supp. 995, 999 n. 6 (N.D.Ill.1981) ("Under the logical consequences of [ALCOA ] there would be no predictability or certainty for contracting parties who selected a future variable to measure their contract liability")). We feel such reasoning is persuasive here where the parties did not opt for a price-reopener provision and indicated instead their choice of stability in the contractual relationship, with the Adjustment Clause and the Equity Clause provisions serving as limited grounds for relief not justified here.
 
 IV
 
 23
 Nevada Power argues that the district court also erred in rulings it made on discovery motions of Nevada Power. These motions "sought discovery relating to what [Nevada Power] believed were the ultimate issues of this case--Beaver Creek's costs of production and the market price of coal." Appellant's Brief at 44. In light of our conclusion agreeing with the interpretation of the coal agreement by the district judge, those subjects were irrelevant. The contract was not tied to the costs of production or the market price of coal. Hence there was no error in the discovery rulings.
 
 
 24
 AFFIRMED.
 
 
 
 *
 The Honorable Howard C. Bratton, Senior United States District Judge for the District of New Mexico, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The base price was divided into components, each of which was subject to adjustment under specified criteria. An inflation/deflation component of the base price was subject to adjustment by the percentage of change that occurred in the U.S. Department of Labor Final Producer's Price Index for Industrial Commodities. Coal Supply Agreement Sec. 8(A)(1), at 7. A materials and supplies component of the base price was to be adjusted by the percentage of change in the Labor Department Final Producer's Price Index for Mining Machinery and Equipment. Id. Sec. 8(A)(2), at 7. A royalty rate component of the base price was to be adjusted to reflect changes in royalty rates applicable to the seller's mines. Id. Sec. 8(A)(3), at 7. A cost of employment component was subject to adjustment under a specified formula. Id. Sec. 8(A)(4), at 8. The agreement provided for an adjustment to reflect increases or decreases in taxes. Id. Sec. 8(A)(5), at 9. Finally, the agreement provided for an adjustment for changes in the seller's costs resulting from changes in governmental regulations. Id. Sec. 8(A)(6), at 11
 
 
 [2]
 The district court granted partial summary judgment in favor of Beaver Creek on the third and fifth claims for relief in Beaver Creek's amended complaint. III R.Doc. 141, at 17. In the same order, the district court dismissed with prejudice the second claim for relief in Nevada Power's amended counterclaim. Id. The district court certified the case for appeal pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Id. Doc. 163